**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAKIESHA SANDERS,** ***individually and on behalf of all others similarly situated*** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 26-2186** |
| | : | |
| **SHOE CARNIVAL, INC.** | : | |

**McHUGH, J.** **September 17, 2026**

## MEMORANDUM

This putative class action is one of the many cases arising out of growing concern for consumers' digital privacy. Plaintiff is one such consumer. She alleges that a major shoe retailer tracked her while she interacted with its website and shared her personal data with third parties without her consent. Plaintiff claims that because she rejected certain tracking cookies, the retailer unlawfully intercepted her sensitive data in violation of Pennsylvania's wiretap statute, invaded her common law right to privacy, and breached its promise to honor her rejection of such data collection. The retailer moves to dismiss, arguing that it did not capture the "contents" of her online communications, and that her allegations as to how its website functions lack sufficient specificity. It further argues that her privacy claim fails because it merely captured metadata, an invasion that cannot be considered highly offensive, one of the elements of the claim. Finally, it contends that Plaintiff's breach of contract claim fails because she cannot establish the elements of a contract, a breach, or legally cognizable damages.

For the reasons set forth below, I conclude that Plaintiff has plausibly alleged a claim under Pennsylvania's wiretap statute. But I agree with the defense that whatever data was harvested as Plaintiff shopped for shoes, such intrusion upon seclusion cannot be viewed as highly offensive to

a reasonable person. And as currently pleaded her contract claim fails to identify recoverable damages.

**I. Facts as Pled**

Plaintiff Lakiesha Sanders is a Pennsylvania citizen who resides in Philadelphia. Compl. ¶ 9, ECF 1. Defendant Shoe Carnival, Inc. owns, manages, and operates the retail website www.shoecarnival.com and its subpages (the "Website"). *Id.* ¶¶ 10–11. Plaintiff alleges that Shoe Carnival procured two third-party vendors—FullStory, a web analytics company, and the social media company TikTok—to embed snippets of JavaScript computer code (the "Code") on the Website, which deploy on each visitor's web browser and intercept in real time the visitor's page views, URLs visited, browser information and IP address, demographic information, form submissions, and other electronic communications ("Website Communications"). *Id.* ¶¶ 2–5. Plaintiff further alleges that the Code intercepted, stored, and recorded "everything" she and putative class members did on the Website, such as "what they searched for, what they looked at, the information they input, and what they clicked on for the entire duration of their visit." *Id.* ¶ 4.

FullStory's software is a session replay script that allows a client to record, reconstruct, and visually play back a visitor's session on its website ("FullStory Code"). *Id.* ¶ 15. The script is installed as a "small snippet" of JavaScript code designed to be unnoticeable to the visitor and deploys automatically when a visitor loads the client's website. *Id.* ¶¶ 16–17. Once installed, Plaintiff alleges, "each click, tap, URL visit, and every other interaction" is transmitted to FullStory's servers, including, among other things, "button clicks, mouse movements, scrolling . . . key presses, text inputs . . . page navigation . . . [and] network requests[.]" *Id.* ¶ 19. The script enables a particular user to be identified across sessions and devices. *Id.* ¶ 18. The Complaint reproduces a screenshot of the FullStory Code as installed on the Website. *Id.* ¶ 20.

The TikTok Pixel is a piece of HTML code placed on a website that tracks the pages that a visitor views, the buttons she clicks, and the information she enters, along with a unique identifier. *Id.* ¶ 26. Plaintiff alleges that the TikTok Pixel intercepts those communications immediately after they are sent and before the website operator receives them and that it also collects the visitor's IP address, her device's make, model, and operating system, her browser information, a unique session identifier, and first- and third-party cookie data that can be associated with a specific user. *Id.* ¶¶ 27–28. According to the Complaint, TikTok uses the data it receives to match activity on the Website to specific individuals and, if the visitor has a TikTok account, in connection with its advertising services. *Id.* ¶ 30. Like the FullStory Code, the Complaint reproduces a screenshot of the TikTok Pixel as installed on the Website but goes one step further, illustrating its operation with a screenshot of what the Pixel captures when a visitor views a specific pair of women's training shoes. *Id.* ¶¶ 31, 33.

Turning to the Website, Plaintiff alleges that it displays a cookie banner telling visitors that Shoe Carnival uses cookies "to measure and improve [its] sites and service, to assist [its] marketing campaigns and to provide personalized content and advertising." *Id.* ¶ 41. The banner advises visitors that "[b]y clicking the button on the right, you can exercise your privacy rights." *Id.* The button on the right is labeled "Cookie Settings," and selecting it opens a window labeled "Do Not Sell or Share My Personal Data." *Id.* ¶ 42. That window explains that a visitor may choose not to allow certain types of cookies but cannot opt out of "First Party Strictly Necessary Cookies," and, under the heading "Manage Consent Preferences," presents toggles by which the visitor may deactivate "Performance Cookies" and "Targeting Cookies." *Id.* ¶¶ 42–43. The window marks Strictly Necessary Cookies as "Always Active," and describes Targeting Cookies as cookies that Shoe Carnival's advertising partners may set and use "to build a profile of your interests and show

you relevant adverts on other sites." *Id.* Targeting Cookies "do not store directly personal information, but are based on uniquely identifying [a visitor's] browser and internet device." *Id.* ¶ 43. Plaintiff alleges that a reasonable visitor understands this interface to mean that third parties will not track her Website Communications if she rejects those categories of cookies, *id.* ¶¶ 44–45, but that Shoe Carnival does not honor that choice to opt out, instead permitting FullStory and TikTok to continue collecting, using, and analyzing Website Communications after visitors have told Shoe Carnival they do not consent, *id.* ¶¶ 46, 66–67.

As to her own visit, Plaintiff alleges that while in Pennsylvania, she visited the Website and certain of its subpages, browsed for various products that Shoe Carnival sells, and "chose to reject cookies when Shoe Carnival presented her with the option." *Id.* ¶¶ 52–53; *see also id.* ¶¶ 22, 34. She further alleges that the Code intercepted the contents of her Website Communications notwithstanding that rejection and simultaneously transmitted them to FullStory and TikTok. *Id.* ¶¶ 56–57. Following her visit, Plaintiff claims she began receiving Shoe Carnival advertisements on her Facebook account featuring items like the products she browsed on the Website, which she attributes "upon information and belief" to the Code capturing her information during the visit. *Id.* ¶¶ 54–55. She alleges that she reasonably expected her visit to be private and that she did not give prior consent to the interception, nor could she have given it, because the interception begins immediately when a visitor loads Shoe Carnival's website. *Id.* ¶¶ 64–65.

Based on these allegations, Plaintiff brings a putative class action on behalf of herself and all others similarly situated, asserting the following three claims: (1) a violation of Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, *et seq.* (WESCA); (2) a Pennsylvania common law claim for intrusion upon seclusion; and (3) breach of contract.

## II. Standard of Review

Within the Third Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

### A. Plaintiff's WESCA claim survives dismissal.

In Count I, Plaintiff alleges that Shoe Carnival violated the WESCA, Pennsylvania's state analogue to the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*, which provides a cause of action to "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of [that statute] against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125 (3d Cir. 2022) (quoting 18 Pa. C.S. § 5725(a)) (cleaned up) ("*Popa II*"). Put differently, the statute "prohibits intercepting communications while allowing someone whose communications have been intercepted to sue the offender." *Id.* Because the relevant provisions and statutory definitions in the WESCA mirror those in the Federal Wiretap Act, "the Court can look to decisions applying those provisions and definitions for guidance." *Cook v. GameStop, Inc.*, 689 F. Supp. 3d 58, 68 n.6 (W.D. Pa. 2023), *aff'd as modified*, 148 F.4th 153 (3d Cir. 2025) ("*GameStop I*").

#### 1. *Plaintiff plausibly alleges the interception of "contents."*

The WESCA defines "contents" as "any information concerning the substance, purport, or meaning of that communication," and "intercept" as acquiring "the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. C.S. § 5702. Although the statute does not define "substance, purport, or meaning," courts in this

Circuit have construed it to mean that a plaintiff must plead that the defendant acquired the "intended message conveyed by the communication," rather than merely metadata, which describe the message's characteristics. *Doe v. Post Acute Med., LLC*, No. 24-547, 2025 WL 511069, at *5 (M.D. Pa. Feb. 14, 2025) (citations omitted); *see GameStop I*, 689 F. Supp. 3d at 68–69 ("Thus, determining whether a plaintiff has adequately pled a violation of the statute often comes down to deciding whether the acquired information can best be characterized as either 'record information' or 'the message conveyed by the communication.'").

In a case involving the Federal Wiretap Act, the Third Circuit explained that although content is distinct from record information (*i.e.*, metadata), the line at which courts should draw that distinction turns on the context surrounding each communication. *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 136–37 (3d Cir. 2015) ("*Google Cookie*"). The court described this content inquiry as "inherently relative" and a "case-specific one turning on the role the location identifier played in the 'intercepted' communication." *Id.* Therefore, the court explained, "[i]f an address, phone number, or URL is instead part of the substantive information conveyed to the recipient, then by definition it is 'content.'" *Id.* at 137. In that case, the court held that because the plaintiffs pleaded "a broad scheme in which the defendants generally acquired and tracked the plaintiffs' internet usage, we are satisfied that this scheme, if it operated as alleged, involved the collection of at least some 'content' within the meaning of the Wiretap Act." *Id.* at 139.

A review of factually analogous cases since the Third Circuit's *Google Cookie* decision reveals that merely navigating a website without conveying anything of substance, like walking around a brick-and-mortar store to browse items for potential purchase, is insufficient to be considered "content" for purposes of pleading a WESCA violation. *See, e.g.*, *GameStop I*, 689 F.

Supp. 3d at 68–71 (dismissing WESCA claim where the plaintiff alleged only that the defendant intercepted "her mouse movements and clicks, keystrokes, and URLs of web pages visited."); *Ingrao v. AddShoppers, Inc.*, No. 24-1022, 2024 WL 4892514, at *13–14 (E.D. Pa. Nov. 25, 2024) (dismissing WESCA claim where the plaintiff failed to allege she searched for any specific information on the retailers' websites, did not provide any personal information during her visits, and lacked allegations tying the tracking code's interaction to her specific communications).

To survive dismissal, therefore, a plaintiff must plausibly allege the defendant's code tracked more than mere website navigation akin to a customer browsing the displayed products of a traditional brick-and-mortal retail store. The following cases illustrate allegations that courts have deemed adequate. In *Oliver v. Noom, Inc.*, the plaintiff alleged that the defendant company used the Code to collect personal information concerning her health and weight loss goals that she inputted in an online quiz. No. 22-1857, 2023 WL 8600576, at *7 (W.D. Pa. Aug. 22, 2023). Judge Stickman of the Western District of Pennsylvania concluded that this information was "clearly part of the substantive information [the plaintiff] was conveying" to the defendant, and that her allegation that the Code "*records all website visitor actions*" necessarily included this information, too. *Id.* (emphasis added). Moreover, Judge Stickman rejected the contention that the plaintiff's allegations lacked specificity, noting that she pleaded the recorded information is stored on "FullStory servers" and can be "linked directly to a website user's identity." *Id.*

More recently, my colleague Judge Murphy held that the plaintiff sufficiently pleaded the interception of his communications' contents by alleging Google captured users' URLs revealing "the subjects searched, the categories browsed, the products viewed, and the products purchased." *Delong v. PHE, Inc.*, No. 24-5212, 2026 WL 2075564, at *8 (E.D. Pa. July 16, 2026). The plaintiff included a screenshot in his amended complaint, among others, showing how a search phrase he

entered on the defendant's website appeared in the URL after the first forward slash and was captured by Google's data tracker. *Id.* at *8. Judge Murphy rejected the defendant's reliance on *GameStop I*, explaining that the plaintiff attached screenshots in his complaint of the precise URLs that Google allegedly captures when users navigate the website. *Id.* at *n.13

And in *Post Acute*, Judge Neary of the Middle District of Pennsylvania concluded that the plaintiff plausibly alleged content interception by pleading that the defendant used pixels to collect "user cookies, IP Address, pages viewed, buttons clicked, patient status, search terms, treatment facilities, and treatments rendered." *Post Acute*, 2025 WL 511069, at *1. Judge Neary explained that "the acquisition of 'at least some content' may be properly inferred from a complaint that includes facts plausibly demonstrating a broad scheme in which the defendants generally acquired and tracked the plaintiffs' internet usage." *Id.* At *5 (quoting *Google Cookie*, 806 F.3d at 139) (cleaned up).

Here, Plaintiff plausibly alleges a "broad scheme" in which Shoe Carnival "generally acquired and tracked" her internet usage by pleading that the Code intercepted, stored, and recorded "everything" she did on the Website, such as what she searched for, what she looked at, the information she input, and what she clicked on for the entire duration of her visit. Compl. ¶ 4; *see Oliver*, 2023 WL 8600576, at *7; *Post Acute*, 2025 WL 511069, at *5. As to FullStory's script, she alleges that it transmits "each click, tap, URL visit, and every other interaction" to FullStory's servers, and that the data captured includes "key presses" and "text inputs." Compl. ¶¶ 2,19. And as to the TikTok Pixel, she alleges that it captures "what pages [visitors] view, buttons they click on, and information they enter, along with a unique identifier." *Id.* ¶ 26. Moreover, Plaintiff alleges that these third parties can use the captured data from the Website to identify specific users, *id.* ¶¶ 18, 30, which, in turn, can lead to those users receiving targeted advertising. These

allegations paint a data-tracking scheme comprehensive enough to survive dismissal at this early juncture. *See Schnur v. JetBlue Airways Corp.*, No. 22-1621, 2024 WL 2816552, at *8 (W.D. Pa. June 3, 2024). Whether some or all this captured data constitutes content is a fact question best suited for resolution with a developed record. *See Oliver*, 2023 WL 8600576, at *7 (holding that in addition to personal information the plaintiff input into the online quiz, whether names, emails, phone numbers, addresses, social security numbers, birth dates, and more are "content" required a developed record); *Delong*, 2026 WL 2075564, at *8 ("Therefore, we think Mr. Delong plausibly alleges that Google intercepted the contents of his communications; we may reexamine this issue at summary judgment with the benefit of a full record."); *Post Acute*, 2025 WL 511069, at *5.

2. *Plaintiff adequately connects the Code to her alleged communications.*

Shoe Carnival also argues that Plaintiff has described how the Code works in general without sufficiently alleging what transpired during her specific interaction. Mot. to Dismiss at 2–3, 7–9. It lists what the Complaint omits: when she visited, which subpages she viewed, which products she browsed, what she typed, and what data was collected from her. *Id.* But at this early stage, "a plaintiff is not required to establish the elements of a prima facie case but instead, need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*, 578 F.3d at 213. Measured against that lenient pleading standard, Plaintiff makes four key allegations: (1) the Code immediately intercepts users' communications without their prior consent; (2) Shoe Carnival embedded the Code on its Website; (3) the Code was operating when Plaintiff visited the Website; and (4) that the Code captured "everything" she did on the Website and instantaneously transmitted it to third parties. Compl. ¶¶ 4, 7, 21–22, 32–34, 57, 63. Those allegations are specific enough to raise a reasonable expectation that the Code

captured Plaintiff's the contents of her communications on the Website and shared them to third parties without her permission.

The authorities Shoe Carnival cites do not require more. In *GameStop I*, the complaint fell short because it lacked "any specific allegations about whether [the] code operated in the manner described" during the plaintiff's visit. 689 F. Supp. 3d at 69. In this case, Plaintiff makes such an allegation. *See* Compl. ¶¶ 21, 57, 63. In *Ingrao*, the court faulted a complaint that recited the code's potential tracking capabilities without alleging that the defendant had "harnessed the capabilities" described with the result of capturing specific communications. 2024 WL 4892514, at *14. Plaintiff makes that allegation here, too. *See* Compl. ¶¶ 21, 31–34, 57.

Shoe Carnival makes much of paragraph 33 in the Complaint, which describes what TikTok allegedly captures "if a Website visitor looks at Women's Nike Initiator Training Shoes." *Id.* ¶ 33. Shoe Carnival correctly notes that the paragraph is written conditionally in that it does not purport to describe Plaintiff's specific visit, and that, standing alone, it could not serve as the basis for her WESCA claim. But Shoe Carnival's myopic view of the Complaint misconstrues the applicable pleading standard. *See Argueta v. U.S. Immigr. & Customs Enf't*, 643 F.3d 60, 74 (3d Cir. 2011) ("[C]ourts must determine whether the complaint as a whole contains sufficient factual matter to state a facially plausible claim."); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety[.]"). Paragraph 33 illustrates the data-tracking mechanism with a screenshot of the transmission it produces; the operative allegation about Plaintiff is paragraph 57, which states that when she visited the Website, the Code immediately intercepted and transmitted the contents of her communications to FullStory and TikTok, which then stored her data in their servers. Compl. ¶ 57. The Court, therefore, is not "forced to speculate about how [the] Code was configured and operated and how [Plaintiff's]

visit[] to [the Website] unfolded." *GameStop I*, 689 F. Supp. 3d at 70. This suffices at this early juncture to "raise a reasonable expectation that discovery will reveal evidence of" interception. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016).

*3. Whether Plaintiff consented is a fact question requiring a record to resolve.*

Shoe Carnival raises consent as a defense. The WESCA permits interception "where all parties to the communication have given prior consent." 18 Pa. C.S. § 5704(4). Shoe Carnival argues that Plaintiff concedes only "certain" categories of cookies could be rejected and contends that FullStory's and TikTok's codes may have fallen within the "Strictly Necessary" or "Functional" categories that the cookie banner describes as "Always Active." Mot. to Dismiss at 11–13; Compl. ¶ 44.

Plaintiff alleges that the Website presented her with a cookie banner and a settings window through which she could disable "Performance" and "Targeting" cookies, that she rejected those cookies, and that she reasonably expected her visit to be shielded from third parties. Compl. ¶¶ 41–44, 52, 64. She further alleges that when visitors configure their consent preferences to disallow these categories of cookies, despite exercising their privacy rights which Shoe Carnival purportedly respects, Shoe Carnival permitted the Code to track them anyway. *Id.* ¶¶ 46, 67. Taking these well-pled allegations as true, which I must, they plausibly allege a refusal of consent. *Popa II*, 52 F.4th at 133.

The cookie banner shows that "Strictly Necessary" cookies could not be disabled. It does not establish that FullStory and TikTok were among them, and Shoe Carnival never quite says they were. Shoe Carnival's contention that "there is no way to tell from the Complaint" which categories the vendors occupied, Mot. to Dismiss at 13, appears to be in tension with the banner's own text: "Targeting" cookies are described as cookies that "may be used by [advertising partners]

to build a profile of your interests and show you relevant adverts on other sites," Compl. ¶ 43, which describes with some precision the conduct Plaintiff attributes to the TikTok Pixel.

None of this forecloses Shoe Carnival's consent defense. Prior consent under the WESCA does not require actual knowledge, and inquiry notice can suffice where a user knew or should have known of the tracking. *Popa II*, 52 F.4th at 132. What Plaintiff selected, how Shoe Carnival classified its vendors, and whether it honored her selections are all questions on which a developed record may weigh in Shoe Carnival's favor. They are simply not questions I can answer without a fuller factual record. *See Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 119 (W.D. Pa. 2019) ("*Popa I*"). Accordingly, dismissal as to Count I is denied.

**B. Plaintiff has not sufficiently alleged intrusion upon seclusion.**

In Count II, Plaintiff alleges that Shoe Carnival violated her privacy. Under Pennsylvania law, to state a claim for intrusion upon seclusion, a plaintiff must show that a defendant (1) intentionally intruded, physical or otherwise; (2) upon the solitude or seclusion of another or his private affairs or concerns; (3) in a way that is substantial; and (4) would be highly offensive to a reasonable person. *Chicarella v. Passant*, 494 A.2d 1109, 1114 (Pa. Super. Ct. 1985); *see Burger v. Blair Med. Assocs., Inc.*, 964 A.2d 374, 379 & n.5 (Pa. 2009) (endorsing the Second Restatement of Torts's definition). The invasion must be "of the sort which would cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Chicarella*, 494 A.2d at 1114 (holding that private investigators did not commit a sufficiently offensive intrusion into the plaintiff's privacy by obtaining his hospital records and disclosing them to the defendant in personal injury litigation); *see, e.g., DeAngelo v. Fortney,* 515 A.2d 594 (Pa. Super. 1986) (giving neighbor's contact information to two contractors who then visited the plaintiff not actionable); *Nagy v. Bell Telephone Co. of Pa.*, 436 A.2d 701, 704–05 (Pa. Super. Ct. 1981) (obtaining from a telephone

company a list of telephone numbers called long distance from subscriber's phone was not a highly offensive or objectionable act to which liability would attach).

I am hard pressed to see how Shoe Carnival's harvesting this information would be highly offensive to a reasonable person. It is not personal health data. It is not financial data. It provides no meaningful insight into the Plaintiff's personal life. And the products are not of an intimate nature. *Cf. Delong,*( sex toy website collected "information related to user's sexual orientation, sexual preferences." 2026 WL 2075564, at *1). Rather the facts here are closer to the cases collected in *Schnur*, 2024 WL 2816552, at *11, where district courts have found that "recording keystrokes and mouse movements alone are simply not enough to reasonably induce mental suffering, shame, and humiliation in ordinary people." Broadway may be able to find drama in one's choice of footwear,[1] but this is a simple case of shopping for shoes. The allegations do not suffice to allege a tort.

**C. Plaintiff has not stated a claim for breach of contract.**

To state a claim for breach of contract under Pennsylvania law, whether express or implied, a complaint must plausibly allege "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

The essential terms of the contract are not precisely defined. At most, Plaintiff can argue that Shoe Carnival's promise not to share her information induced her to navigate the site where she otherwise might have declined to do so. Even if one assumes there was an implied contract,

[1] *E.g. Kinky Boots,* (Music Theater International), *Do Patent Leather Shoes Really Reflect Up?* (Concord Theatricals), *Spike Heels* (Concord Theatricals).

Plaintiff does not plead damages that would be recoverable for a breach. The Complaint certainly pleads that certain forms of personal information have value to retailers and data brokers, but the market for such information only trades in one direction – the harvesting of consumer data. There is no parallel market where individuals can sell their personal data to marketers or brokers. Plaintiff claims a loss of the "economic value of their interactions with Defendant's Website," Complaint, ¶ 107, but the contract alleged does not entitle Plaintiff to such compensation, no money changed hands, and Plaintiff does not demonstrate how in practical terms she would otherwise benefited from the "economic value allegedly lost. "[B]reach of contract damages are intended to place the non-breaching party "nearly as possible in the same position [it] would have occupied had there been no breach…" and the "aggrieved party can recover nothing more than will compensate [it]." *Vinculum, Inc. v. Goli Techs.,* LLC, 310 A.3d 231, 249–50 (Pa. 2024) (citations omitted). I can discern no way in which Plaintiff suffered a quantifiable loss from the breach alleged. And to the extent that she seeks recovery for intangible privacy interests, such damages are not recoverable in a contract action. As pleaded, Count III fails to state a claim.

**IV. Conclusion**

For the reasons set forth above, Defendant's Motion to Dismiss will be granted as to Counts II and III. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge